IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

GARY EVANS, JR.,                          )
                                          )
            Plaintiff,                    )        CIVIL ACTION NO. 3:14-CV-125
                                          )
      v.                                  )        JUDGE KIM R. GIBSON
                                          )
CERNICS, INC. d/b/a CERNICS               )
SUZUKI, JEFFREY CERNIC, and               )
EDWARD CERNIC, JR.,                       )
                                          )
            Defendants.                   )

## MEMORANDUM OPINION

## I.      Introduction

Plaintiff Gary Evans, Jr., a former employee of Defendant Cernics, Inc. d/b/a Cernics Suzuki ("Cernics Inc."), commenced this civil action against Cernics, Inc., Jeffrey Cernic, and Edward Cernic, Jr. for alleged violations of the Americans with Disabilities Act ("ADA"), as amended, 42 U.S.C. § 12101 *et seq.,* and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Stat. Ann. § 951 *et seq.*  Presently pending before the Court is Plaintiff's motion for summary judgment (ECF No. 38) on both counts.  For the reasons that follow, the motion will be denied.

## II.     Jurisdiction and Venue

The Court has jurisdiction over Plaintiff's ADA claims pursuant to 28 U.S.C. § 1331.  The Court has jurisdiction over Plaintiff's PHRA claims pursuant to 28 U.S.C. § 1367.  Venue is appropriate pursuant to 28 U.S.C. § 1391(b)(2).

### III. Factual Background[1]

Plaintiff is an individual who has worked in the motorcycle business for more than twenty-five years. (ECF No. 46 ¶ 2.) Prior to being employed by Cernics, Inc., Plaintiff worked as a regional service representative for Suzuki Motor Corporation's motorcycle division, where he gained specialized expertise in the servicing of Suzuki products. (Id. ¶ 235; ECF No. 49 ¶ 235; see also E. Cernic Dep. at 82:8-10, 208:4-6, ECF No. 40-43.)

Defendant Cernics, Inc. is a Pennsylvania business engaged in the sale and servicing of ATVs and motorcycles, among other products. (ECF No. 1 ¶ 7; ECF No. 15 ¶ 7; ECF No. 46 ¶ 16.) During times relevant to this litigation, Cernics, Inc. operated stores in Duncansville and Johnstown, Pennsylvania. (ECF No. 46 ¶¶ 8, 215; ECF No. 49 ¶ 215.) The stores had three separate departments consisting of sales, service, and parts. (ECF No. 46 ¶ 204; ECF No. 49 ¶ 204.)

Defendants Jeff Cernic ("Jeff" or "Jeff Cernic") and Ed Cernic, Jr. ("Ed" or "Ed Cernic") are brothers with an ownership interest in Cernics, Inc. (Id. ¶ 14.) During the time period in question, Ed Cernic handled human resource functions for the business, including disciplining and terminating employees and handling their requests for work-related accommodations. (Id. ¶¶ 15, 20, 216; ECF No. 49 ¶ 216.)

In January 2010, Plaintiff was hired as a general manager for the company's Duncansville location. (Id. ¶¶ 3-4, 8.) At the time, Suzuki's products were the largest

---

[1] The factual background is derived from the undisputed evidence of record and the disputed evidence of record viewed in the light most favorable to Defendants, the nonmoving parties. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 265 (1986) ("The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.") (internal quotations omitted).

component of Cernic, Inc.'s product line. (E. Cernic Dep. at 208:7-9, ECF No. 40-43.) Ed Cernic believed that Plaintiff had more expertise with Suzuki products than anyone who was on his service staff at the time. (*Id.* at 208:13-16.) In particular, Ed felt that Plaintiff knew how to "troubleshoot [and] diagnose problems." (*Id.* at 209:7-8.) He also "knew how to navigate through the warranty claim process" and, because he had contacts at Suzuki, he "really [knew] who[m] to talk to" about problems. (*Id.* at 209:8-12.)

At the time of Plaintiff's hiring, Cernics, Inc.'s service department was "struggling a little bit." (*Id.* at 208:8-9.) The Cernic brothers were also looking for someone to take over Jeff Cernic's role as general manager of the Duncansville store and "guide the business there." (*Id.* at 208:10-11; *see id.* at 82:18-20, 85:16-22.) Plaintiff was hired as a general manager and service manager with the idea that he would "guide and manage" the entire business at the Duncansville store, with a "special emphasis" on getting the service department "whipped into shape." (*Id.* at 208:20-23; *see also* ECF No. 46 ¶ 234; ECF No. 49 ¶ 234.) The position was created specifically for Plaintiff and included the general manager duties to justify a higher salary. (ECF No. 46 ¶ 236; ECF No. 49 ¶ 236; E. Cernic Dep. at 85:16-22, ECF No. 40-43.)

In his capacity as General Manager of the Duncansville location, Plaintiff worked full-time under the supervision of Ed Cernic. (ECF No. 46 ¶¶ 5, 8, 15.) He was told by Ed that he was expected to run the store like his own name was on the building, which Plaintiff understood to mean that he was responsible for everything that took place inside the building. (*Id.* ¶¶ 237-238; ECF No. 49 ¶¶ 237-238.) His numerous responsibilities included supervising employees, enforcing company policies and preparing the staff schedule, serving as an expert technician and manager in the service department, identifying and analyzing issues with all

machines and vehicles brought into Cernics, Inc., operating and test-driving vehicles, providing instruction and guidance to other technicians, conducting vehicle safety inspections, picking up and delivering machine parts in the Duncansville area, operating a fork lift to load and unload products in the service department, maintaining and completing payroll, completing clerical paperwork for the purpose of ordering equipment and supplies, and completing paperwork for the registration of vehicles. (ECF No. 46 ¶ 9.) At the Duncansville store, Plaintiff was one of only two employees who could perform state vehicle inspections, a task which involved driving the vehicle under inspection. (E. Cernic Dep. at 213:23-214:15, 222:23-223:10, ECF No. 40-43.)

In 2012, Plaintiff began to experience fatigue, pressure in his chest, and a sensation where he could feel his heart beating. (ECF No. 46 ¶ 42.) Initially, he noticed these symptoms in the evening or later in the day while cutting grass, walking, or going up steps. (Id. ¶ 43.) In May 2012, Plaintiff was seen by Kristi Berzansky, a certified physician's assistant, who assessed that he had anxiety and hypertension. (Id. ¶ 44.) Plaintiff reported that he had been taking Xanax but ran out in March and was now anxious and felt his "heart racing [at] night." (ECF No. 40-27 at 2.) Plaintiff also reported that his work was stressful, he was agitated, and he was having difficulty staying asleep at night. (Id.) After this visit, Plaintiff continued to experience a "hard beat" in his chest. (Pl.'s Dep. at 54:4-5, ECF No. 40-1.)

By August 2012, Plaintiff did not have any medical limitations but was feeling more tired at the end of the day. (ECF No. 46 ¶ 50.) He was seen by Mark E. Tilyou, M.D. on August 17, 2012, with complaints of lightheadedness and feeling like his heart would "jump out of his chest" when he climbed the thirteen stairs in his house. (ECF No. 40-28 at 2.) Dr. Tilyou

continued Plaintiff on medication for his hypertension and anxiety and referred Plaintiff to George Jabbour, M.D., a cardiologist, for evaluation of his chest pain.  (*Id.*)

Plaintiff was seen by Dr. Jabbour on August 21, 2012.  (ECF No. 40-29.)  At that time, Plaintiff reported experiencing shortness of breath at work and when climbing stairs, chest discomfort with moderate activities, and daily palpitations associated at times with dizziness.  (*Id.* at 2.)  Dr. Jabbour prescribed a Holter monitor to be worn over a two-week period.  (ECF No. 40-30.)  A summary report documented Plaintiff's complaints of chest discomfort, heart racing, and shortness of breath on various dates on specific dates in September 2012.  (*Id.*; ECF No. 46 ¶ 54.)  The data from the monitor showed that Plaintiff's complaints of heart racing and chest discomfort often correlated with episodes of ventricular bigeminy or multiple premature ventricular contractions ("PVC's").[2]  (ECF No. 40-30 at 2.)

On September 27, 2012, Plaintiff underwent an Exercise Nuclear Stress Test and Echocardiogram.  (ECF No. 40-32.)  Plaintiff's echocardiogram revealed mildly reduced left ventricular function and dilation along with a trace of mitral and tricuspid regurgitation.  (*Id.* at 2-3.)  Based on these tests, Dr. Jabbour informed Plaintiff that he had a ventricular tachycardia,[3] or an irregular heartbeat in his ventricular chambers.  (ECF No. 46 ¶ 57; Pl.'s Dep. at 62:12-17, ECF No. 40-1.)  Later that day, Plaintiff sent an email to Ed Cernic, stating that "[t]he stress tests I had today show I have a blockage in my heart.  I am having a heart catheterization on Tuesday

---

[2] PVCs are an abnormal beat coming from the bottom chambers of the heart.  (ECF No. 46 ¶ 58; Hreibe Dep. at 58:18-19, ECF No. 40-49.)

[3] A ventricular tachycardia is a rapid heart originating from the bottom chambers of the heart.  (ECF No. 46 ¶ 58; Hreibe Dep. at 58:14-16, ECF No. 40-49.)

5

and he doesn't want me to work or do much of anything till then. He said I can do payroll Saturday and I will do any deals Bob has the rest of this week." (ECF No. 40-8 at 2.)

On October 2, 2012, Dr. Jabbour performed the catheterization, which revealed normal coronary anatomy and normal left ventricular function. (ECF No. 40-33 at 3.) Plaintiff was examined by Haitham Hreibe, M.D. on October 10, 2012, at which time he complained of "frequent dizzy spells where he feels his [heart] pounding and feel[s] [lightheaded]." (ECF No. 40-34 at 2.) Dr. Hreibe noted that, during his recent exercise stress test, Plaintiff had experienced an episode of "[Non-Sustained Ventricular Tachycardia] . . . where [he] was about to pass out." (Id.) Plaintiff reported that his symptoms were present most of the time, were worse with activity, and were relieved by rest. (Id.) Following his examination, Dr. Hreibe prescribed Verapamil and Flecainide Acetate to address Plaintiff's ventricular tachycardia. (Id. at 6.)

On Saturday, October 13, 2012, Plaintiff emailed Ed Cernic, stating that "[t]he new medication seems to help my heart beats[.] I will talk to the Dr. on Monday [and] should be cleared to work for Tuesday." (ECF No. 40-13 at 2.) On October 15, 2012, Dr. Hreibe provided a note in which he stated that "[Plaintiff] has been under my care since October 10, 2012. He may return to work as tolerated." (ECF No. 40-4 at 2.) In a subsequent certification prepared for this litigation and dated May 29, 2015, Dr. Hreibe averred that "as of October 15, 2012, [Plaintiff] was physically able to return to work on a full-time basis and perform his job duties." (ECF No. 40-5 ¶ 5.) Regarding his conclusion that Plaintiff could "return to work as tolerated," Dr. Hreibe stated that he had meant that "[Plaintiff] was able to return to his full-time job but that he may need to take sporadic time off from work if he felt tired or dizzy or had any other effects

from the medication I prescribed to him." (*Id.* ¶ 6.)  At his deposition in this litigation, Dr.

Hreibe expressed the opinion that, as of October 15, 2012, Plaintiff would have been capable of

operating a motorcycle at work or helping another person carry a 200-pound motor.  (ECF No.

46 ¶ 115.)  It is undisputed, however, that the opinions set forth in Dr. Hreibe's May 29, 2015,

certification and in his deposition testimony were not shared with Ed Cernic or known to him

as of October 2012, when Ed received Dr. Hreibe's return-to-work note.

Upon receiving Dr. Hreibe's note, Ed Cernic spoke with Plaintiff by telephone and told

him that he needed a "full release" in order to come back to work.  (*Id.* ¶ 117.)  Thereafter, with

Plaintiff's permission, Ed attempted on multiple occasions to contact Dr. Hreibe to obtain

clarification regarding the October 15 note; however, Dr. Hreibe never returned Ed's telephone

calls.  (*Id.* ¶¶ 267-271; ECF No. 49 ¶¶ 267-271.)  After not hearing back from Dr. Hreibe, Ed

asked Plaintiff to have Dr. Hreibe contact him.  (ECF No. 46 ¶ 272; ECF No. 49 ¶ 272.)  Because

he considered Dr. Hreibe's note to be insufficient and had not heard back from Dr. Hreibe, Ed

asked Plaintiff to undergo an independent medical examination ("IME").  (ECF No. 46 ¶ 230;

ECF No. 49 ¶ 230.)  According to Ed, Plaintiff never responded to his request.  (ECF No. 46 ¶

232.)

Meanwhile, Plaintiff continued to report to work between October 16 and 24, 2012.  (ECF

No. 46 ¶ 119; ECF No. 40-14 at 2.)  On October 25, 2012, while at work, Plaintiff experienced

fatigue and difficulty concentrating.  (ECF No. 46 ¶ 68.)  He contacted Ed and stated that he was

"leaving now cause [I] am dizzy, dr [sic] changed my meds yesterday so this will stop.  He also

said I will feel like this for a couple days.  Call me if you have questions about anything."  (ECF

No. 40-11 at 2.)  Ed replied, "Gary[,] [y]ou need to stay home until you are better.  I will need

you to have your Dr [sic] give u [sic] an unconditional release before you come back.  I don't want you to have bigger problems until your [sic] straightened out."  (*Id.*)

The following day, Ed Cernic submitted a report to the Altoona Unemployment Compensation Service Center concerning Plaintiff's situation.  The report stated:

> On 10/25/2012[,] I was made aware that [Plaintiff] has been experiencing dizziness while on the job.  Due to this fact, I spoke with him and told him that he will need to have an independent medical review done with a work release that is more specific to the nature of his condition in order for him to continue to report to work.  The current work release stating to be able to work as tolerated needs to be clarified in more detail due to the nature [of] [Plaintiff's] illness.
>
> Although [Plaintiff's] job is [available], I am concerned for his well being[,] as well as others[,] while he is at work or coming to and from work.

(ECF No. 40-14 at 2-3.)  Ed subsequently received a notice that Plaintiff had filed an application for unemployment compensation benefits.  (ECF No. 46 ¶ 288; ECF No. 49 ¶ 288.)  The notice stated that Plaintiff had indicated the reason for separation or partial unemployment as "quit - health or other reasons."  (ECF No. 46-15 at 1.)

Because Plaintiff did not produce an unconditional release from Dr. Hreibe, Ed Cernic concluded that "the doctor wouldn't give it to him," and, therefore, Plaintiff "would not be able to do his job for the position we hired him for."  (E. Cernic Dep. at 123:11-15, ECF No. 40-43.)

On November 12, 2012, Ed sent Plaintiff a letter in which he stated:

> Due to the notification received from you that your doctor is stating that you are unable to return to work due to your current medical condition, I am informing you of your insurance benefit status at this time.  In accordance with the Cernic's employee handbook Section VI on Leave of Absence, your health coverage will remain in effect to 11/30/2012.  As a result, you will be receiving a continuance of coverage notification under COBRA as a follow up to this letter.

(ECF No. 40-20 at 2.)

On November 20, 2012, Plaintiff underwent an unsuccessful cardiac ablation. (ECF No. 46 ¶ 72; ECF No. 40-35 at 2.)   During a post-surgical evaluation on November 28, Plaintiff reported that he was continuing to experience palpitations and was exhausted at the end of the day.   (ECF No. 40-35 at 2.)   He stated that he was unable to complete a nine-hour workday and was "drained by [seven hours]."   (Id.)

In the meantime, Plaintiff emailed Ed Cernic on November 25, 2012, to advise that he had received the letter concerning the cancellation of his health insurance and that this was adding "more stress to an already very stressful situation."   (ECF No. 40-21 at 2.)   In his email, Plaintiff took issue with Ed's conclusion that he was unable to work:

> My [doctor] said I could work as tolerated, (if my heart is racing, I am dizzy or fatigued I should go home and rest) not that I cannot work.   YOU are the one person who determined I could not work until I was cleared unconditionally.
>
> I have bills to pay and a family to feed and I will do what it takes to support them.   I contacted the Unemployment office who [sic] determined I was eligible to collect unemployment since you were unwilling to allow me to work under the [doctor's] recommendations.
>
> Prior to your decision[,] I worked my regularly [sic] daily schedule every day[,] including Rock Run[,] until my medicine was changed on (10-24-12).   On Thursday, 10-25-12, I left two hours early because I was feeling dizzy.   People sometimes do get sick at work and need to leave early, it happens!   Since then, I have been performing many of my tasks and getting enough hours to cover my portion of the medical insurance[,] just like when I have been laid off the previous two winters.
>
> My question is, after all I have done over the past three years in the current economic conditions for you and your company, how can you consciously do this to me?

(Id.)   Ed Cernic responded to Plaintiff's email the following day:

> I [don't] mean to give you any more stress than you already have.   However[,] I cannot put other employees and customers and the general public at risk until

you get a clean bill of health to return to work.  At this point[,] the only way I get any information about your situation is second and third hand.  I need you to get yourself well.  If you want to return to work full time[,] I will make arrangements with a [d]octor to give you a check-up, and with his approval only can I allow you to come back to work.  This inconsistency [hasn't] done anything to relieve me from stress so that you know.  I am trying to make the best out of a bunch of bad situations to keep everyone in work.  Let me know what you decide.

(ECF No. 46-13 at 1.)

During an office visit on November 30, 2012, Dr. Tilyou noted that Plaintiff was "having issues at his job," as his "manager is discontinuing his health insurance – [won't] let [patient] work -- [patient] filed for [unemployment compensation].  (ECF No. 46-24 at 1.)  Stating that he had reviewed "all of the letters from Cardiology," Dr. Tilyou determined that Plaintiff was "in need [of] further work up and/or possible hospital admission and probable ablation procedure repeated."  (Id. at 2.)  Dr. Tilyou opined, "[Plaintiff] states he is having issues at work and as his Physician, I cannot see how [he] can work full time."  (Id.)  Dr. Tilyou advised Plaintiff to seek legal counsel.  (Id.)

Ed Cernic sent a final letter to Plaintiff on December 22, 2012, indicating:

I am in receipt of your letter dated 12/21/2012.  I do acknowledge what vague back to work order your Doctor gave you, and when you had to go home a couple of days after that because you said you got dizzy and was [sic] blacking out, I felt it was best for you and for our other employees that you remained off until you had recovered completely.  You filed for unemployment compensation and were awarded it.  I am addressing your status as medically unemployed until you have a full unconditional release from your Doctor and then have seen our Company Doctor.

Please inform me of when you have a full release from your Doctor.  So you know, I did try to return your call twice and left a message for you[.]  I'm sorry that you and I have not connected[;] however[,] I have a busy schedule also.  As for your statement feeling disappointed and betrayed[,] I am sorry you feel that way and we will need to deal with your feelings if you are to return to work when recovered.

(ECF No. 40-22 at 2.)

It does not appear that any further communications occurred between Plaintiff and Ed Cernic concerning the status of his employment. It also appears that Plaintiff never returned to his work at Cernics, Inc. following his departure on October 25, 2012.

The record does reflect, however, that Plaintiff continued to obtain treatment for his ventricular tachycardia. In March 2013, he treated with David Callans, M.D. and presented with symptoms that Dr. Callans considered "fairly severe." (Callans Dep. at 8:2-6, ECF No. 40-37.) At that time, Plaintiff was "having some trouble getting through day-to-day activities" but was "managing to." (Id. at 12:23-25.) On March 27, 2013, Dr. Callans performed a left ventricular PVC ablation on Plaintiff, which was successful. (ECF No. 40-38 at 2; ECF No. 40-39 at 2.) Following this procedure, Plaintiff was restricted from stair climbing and heavy lifting for a period of one week. (ECF No. 40-39 at 2.) Dr. Callans did not impose any other lifting restrictions on Plaintiff at that time, and he did not restrict Plaintiff's ability to drive or to work. (ECF No. 46 ¶¶ 84-89; Callans Dep. at 13:14-22, 40:3-6, 49:14-50:9, ECF No. 40-37.)

Following this second ablation, Plaintiff's symptoms improved significantly and his left ventricular functioning normalized. (ECF No. 40-40 at 2.) On May 30, 2013, Dr. Callans issued a letter clearing Plaintiff "to return to work without restrictions." (Id.) Plaintiff later sought treatment in October 2013 and again in May 2014 for symptoms related to his hypertension and ventricular tachycardia. (ECF No. 40-41; ECF No. 40-42.) Notwithstanding his symptoms, however, Plaintiff was able to work forty-five hours per week throughout 2014 and 2015 without any problems. (ECF No. 46 ¶¶ 93-95, 97-98.)

There is no dispute that the primary decisionmaker in this case relative to Plaintiff's employment was Ed Cernic. At his deposition, Ed testified about his interactions with Plaintiff as they related to Plaintiff's medical condition and his ability to work. According to Ed, Plaintiff's job as general manager required him to work about forty-five hours per week and be present almost every day the shop was open. (E. Cernic Dep. at 92:19-93:15, ECF No. 40-43.) Plaintiff was responsible for supervising employees, diagnosing problems in customers' motorcycles and ATVs, performing inspections, recommending ordering and staffing levels, ensuring that units were displayed, interacting with customers, processing sales, performing appraisals on trade-ins, and overseeing the sales staff, among other things. (*Id.* at 89:13-24, 95:11-96:16.)

At some point during Plaintiff's employment, Ed learned that Plaintiff had gone to the doctor and was going to be wearing a heart monitor. (*Id.* at 98:22-99:13.) At that time, Ed did not have any reason to believe that Plaintiff could not perform his job duties or that he would pose a danger to himself or others in the workplace. (*Id.* at 103:2-104:19.) Plaintiff took time off as needed for his medical appointments and, as manager, he could arrange his own schedule and "come and go a little bit." (*Id.* at 124:12-17, 126:5-17.) At a later point, however, Plaintiff informed Ed that he was "blacking out" and "passing out." (*Id.* at 113:14-114:6.) Ed also learned from other employees of an incident in which Plaintiff had reportedly passed out at work and was unresponsive for a period of time. (*Id.* at 151:4-152:21.) After learning about Plaintiff's blackouts, Ed became concerned that Plaintiff might not be physically able to perform his job safely, particularly as it pertained to activities like test driving motorcycles and operating a forklift. (*Id.* at 126:18-127:24, 213:23-214:24, 217:8-16.) At the same time, because Ed had "very

little" information about Plaintiff's medical condition, he asked for an unconditional release to ensure that Plaintiff could safely perform his job duties. (*Id.* at 112:1-10, 126:18-127:5.) Within a week or so after Dr. Hreibe indicated that Plaintiff could return to work "as tolerated," Ed tried at least twice to contact Dr. Hreibe and left messages. (*Id.* at 29:16-32:22.) He asked Plaintiff to have Dr. Hreibe call him, but Ed never heard back from Dr. Hreibe. (*Id.* at 33:2-34:13, 156:4-21.) Ed also asked Plaintiff to see another doctor who would perform an independent medical examination, but Plaintiff never responded to Ed's request. (*Id.* at 46, 129:18-130:10.)

Plaintiff never provided an unconditional release and never returned to work at Cernics, Inc. From Ed Cernic's perspective, Plaintiff's separation was a result of him quitting, because his job would have been available to him if he had provided the requested release. (*Id.* at 142:3-14.) Ed also acknowledges, however, that Plaintiff was able to collect unemployment compensation following his separation from Cernics, Inc. (*Id.* at 142:6-8.)

On June 16, 2014, Plaintiff commenced the instant action with the filing of his two-count complaint. (ECF No. 1.) In Count I, Plaintiff claims that Defendants violated the ADA by terminating him on account of his impairments and/or health conditions, by retaliating against him after he attempted to exercise his rights under the ADA, and by refusing to accommodate his disabilities through engagement in an "interactive process." (*Id.* ¶¶ 32-38.) In Count II, Plaintiff asserts identical violations under the PHRA. (*Id.* ¶¶ 39-42.)

On September 25, 2015, Plaintiff filed the pending motion for summary judgment and supporting documents. (ECF Nos. 38, 39, 40.) Defendants filed their brief in opposition and related documents on November 3, 2015. (ECF Nos. 45, 46.) Thereafter, Plaintiff submitted his

documents in reply. (ECF Nos. 49, 50.) As a result of the foregoing filings, the pending motion is now ripe for adjudication.

## IV.     Standard of Review

A grant of summary judgment is appropriate when the moving party establishes that "'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Heffernan v. City of Paterson*, 777 F.3d 147, 151 (3d Cir. 2015) (quoting FED. R. CIV. P. 56(a)). A genuine issue of material fact is one that could affect the outcome of litigation. *Mahoney v. McDonnell*, 616 Fed. Appx. 500, 504 (3d Cir. 2015) (citing *Anderson*, 477 U.S. at 247). However, "'[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial.'" *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The initial burden is on the moving party to adduce evidence illustrating a lack of genuine issues. *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Once the moving party satisfies its burden, the non-moving party must present sufficient evidence of a genuine issue, in rebuttal. *Id.* (citing *Matsushita Elec. Indus. Co.*, 475 U.S. at 587). When considering the parties' arguments, the Court is required to view all facts and draw all inferences in the light most favorable to the non-moving party. *Id.* (citing *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994)). Further, the benefit of the doubt will be given to allegations of the non-moving party when in conflict with the moving party's claims. *Bialko v. Quaker Oats Co.*, 434 Fed. Appx. 139, 141 n.4 (3d Cir. 2011) (citing *Valhal Corp. v. Sullivan Assocs.*, 44 F.3d 195, 200 (3d Cir. 1995)).

Nonetheless, a well-supported motion for summary judgment will not be defeated where the non-moving party merely reasserts factual allegations contained in the pleadings. *Id.* (citing *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989)). The non-moving party must resort to affidavits, depositions, admissions, and/or interrogatories to demonstrate the existence of a genuine issue. *Connection Training Servs. v. City of Philadelphia*, 358 Fed. Appx. 315, 318 (3d Cir. 2009) (citing *Celotex Corp.*, 477 U.S. at 324).

## V.    Discussion

In Counts I and II of the Complaint, Plaintiff alleges that the Defendants violated the requirements of the ADA and the PHRA, respectively, by failing to reasonably accommodate his disability and by terminating his employment because of his disability. Plaintiff requests that summary judgment be entered in his favor relative to both of these theories.[4]

As an initial matter, the Court notes that Plaintiff has stated that "[t]he PHRA's prohibition against disability discrimination is construed in accordance with the ADA." (ECF No. 39 at 6.) However, Congress substantially modified the standard for establishing a "disability" under the ADA when it enacted the ADA Amendments Act of 2008 ("ADAAA"). *See* Pub. L. No. 110–325, 122 Stat. 3553 (codified in various provisions of 42 U.S.C. §§ 12101 *et seq.*). Because the PHRA has not been similarly amended, some courts have concluded that PHRA claims must be separately analyzed, at least with respect to issues concerning a claimant's "disability." *See, e.g.*, *Szarawara v. Cnty. of Montgomery*, No. 12-CV-5714, 2013 U.S.

---

[4] Plaintiff also alleges in Count I that he was fired in retaliation for having requested a reasonable accommodation. (ECF No. 1 ¶ 37.) Because Plaintiff's pending motion for summary judgment does not address this particular theory, the Court need not discuss it further in this Memorandum Opinion.

Dist. LEXIS 90386, *7 (E.D. Pa. June 27, 2013) ("[T]he PHRA has not been similarly amended, necessitating separate analysis of Plaintiff's ADA and PHRA claims.").

For present purposes, it does not appear that Defendants are challenging Plaintiff's ability to demonstrate a "disability" under either the ADA or the PHRA. Accordingly, any change that the ADAAA may have wrought with respect to the governing legal standards for ADA claims does not affect the Court's analysis of the PHRA claim in this case. *See Kieffer v. CPR Restoration & Cleaning Serv., LLC*, No. 15-CV-3048, 2016 U.S. Dist. LEXIS 101866, at *23-24 n.9 (E.D. Pa. Aug. 3, 2016) (explaining the different standards of the ADA and PHRA relative to "disability" and concluding that "because this element is uncontested, the different standards do not alter the Court's analysis"). The Court also notes that the PHRA claim in Count II of the complaint is premised upon the same allegations of disability discrimination that serve as the basis of Plaintiff's ADA claim in Count I. (*See* ECF No. 1 ¶¶ 32-42.) Consequently, the Court will address the two claims collectively under the rubric of ADA principles. *See Macfarlan v. Ivy Hill SNF, LLC*, 675 F.3d 266, 274 (3d Cir. 2012) (noting that "the [Rehabilitation] Act, ADA, and PHRA . . . are all to be interpreted consistently," and that "all have the same standard for determination of liability").

Title I of the ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C.A. § 12112(a). Among the acts that can constitute unlawful discrimination are the following:

(5)(A) not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity; or

(B) denying employment opportunities to a job applicant or employee who is an otherwise qualified individual with a disability, if such denial is based on the need of such covered entity to make reasonable accommodation to the physical or mental impairments of the employee or applicant.

*Id*. § 12112(b)(5)(A)-(B).

To establish a prima facie case of discrimination under the ADA, a plaintiff must show: (1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an adverse employment decision as a result of discrimination. *Gaul v. Lucent Techs., Inc.*, 134 F.3d 576, 580 (3d Cir. 1998). In the context of a "failure-to-accommodate" claim, the "adverse employment decision" is the refusal to make reasonable accommodations for a plaintiff's disability. *See Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 761 (3d Cir. 2004); *Ballard-Carter v. Vanguard Group, Inc.*, No. 15-5370, 2016 U.S. Dist. LEXIS 97512, at *31 (E.D. Pa. July 26, 2016). Here, Plaintiff's failure-to-accommodate and unlawful termination claims coalesce because Plaintiff asserts that he was precluded from returning to work as a result of the Defendants' failure to reasonably accommodate his disability. Defendants, in turn, dispute that Plaintiff was a "qualified individual" or that he suffered an adverse employment decision.[5]

---

[5] In responding to Plaintiff's motion for summary judgment, Defendants contend that Plaintiff cannot satisfy certain elements of his discrimination claims as a matter of law. However, Defendants did not file a cross-motion for summary judgment, nor does their brief satisfy all of the requirements of this Court's local rules relative to the filing of Rule 56 motions. *See* LCvR 56. Accordingly, the Court will evaluate the

Under the ADA, the term "qualified individual" is defined to mean "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C.A. § 12111(8). For the purposes of determining whether Plaintiff is a "qualified individual," the court must give consideration "to the employer's judgment as to what functions of a job are essential." *Id.*

As the ADA claimant, Plaintiff "bears the initial burden of proving that he is qualified and, 'if an accommodation is needed, the plaintiff must show, as part of [his] burden of persuasion, that an effective accommodation exists that would render [him] otherwise qualified.'" *Gardner v. Sch. Dist. of Phila.*, 636 F. App'x 79, 83-84 (3d Cir. Dec. 17, 2015) (quoting *Walton v. Mental Health Ass'n*, 168 F.3d 661, 670 (3d Cir. 1999)) (alteration in the original). "The determination of whether an individual with a disability is qualified is to be made at the time of the employment decision." 29 C.F.R. § Pt. 1630, App; *see also Gaul*, 134 F.3d at 580; *Kessler v. AT&T*, No. 3:13-CV-207, 2015 U.S. Dist. LEXIS 126888, at *19 (M.D. Pa. Sept. 22, 2015).

Defendants contend that Plaintiff was not qualified to perform his essential job functions because, at the time of the relevant employment decision, he was experiencing episodes of blacking out.[6] According to Defendants, these episodes legally disqualified Plaintiff from driving and this, in turn, made him incapable of performing essential job functions, such as conducting state vehicle inspections and test-driving vehicles during the repair process. *See* 67 Pa. Code § 83.5(a)(4) ("A person who has any of the following conditions will not be qualified to

Defendants' arguments only insofar as it is necessary to determine whether genuine disputes of material fact on this record preclude summary judgment in Plaintiff's favor.

[6] Although Plaintiff denies ever blacking out at work, he recognizes that this is a disputed issue of fact on the present record. (*See* ECF No. 46 ¶¶ 258, 282; ECF No. 49 ¶¶ 258, 282.)

drive: . . . [p]eriodic episodes of loss of consciousness which are of unknown etiology or not otherwise categorized, unless the person has been free from episode for the year immediately preceding.").

Plaintiff insists that this theory is baseless because the regulation in question references "cerebral vascular insufficiency and cardiovascular disease," conditions which he did not have. Plaintiff is correct that the regulation *does* list symptoms associated with cerebral vascular insufficiency or cardiovascular disease as one type of "condition" that will preclude driving; however, this condition is listed in the disjunctive, separate and apart from "[p]eriodic episodes of loss of consciousness." Thus, the latter condition does not depend upon the driver having cerebral vascular insufficiency or cardiovascular disease. *See id.* § 83.5(a)(3)-(a)(4).

Plaintiff also points out that Dr. Hreibe did not place any driving restrictions on him as of October 2012. (Hreibe Dep. at 52:13-16, ECF No. 40-49.) However, it is not clear from the cited testimony the extent to which Dr. Hreibe specifically took into account the blackouts that Plaintiff was allegedly experiencing when he declined to issue driving restrictions. In any event, Dr. Hreibe's medical opinion would not be dispositive of the question whether, by operation of law, Plaintiff was precluded from legally driving under the cited regulation. While the present record is somewhat underdeveloped on this issue, on balance, the Court finds Defendants' proffer to be at least marginally sufficient to raise a genuinely disputed issue of fact relative to Plaintiff's qualification for his job.

There are also disputed questions of fact on this record relative to the issue of whether Cernics, Inc. failed to grant Plaintiff a reasonable accommodation for his disability. To prove a failure to accommodate, a plaintiff must show: (1) the employer knew about the employee's

disability; (2) the employee requested accommodations or assistance for his or her disability; (3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith. *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 319-20 (3d Cir. 1999); *Munoz v. Nutrisystem, Inc.*, No. 13-CV-4416, 2014 U.S. Dist. LEXIS 104465, at *17-18 (E.D. Pa. July 30, 2014).

In this case, the first and second elements of Plaintiff's claim are satisfied. There is no dispute that Ed Cernic was at least generally aware of Plaintiff's disability. The record is also clear that Plaintiff notified Ed of his need for an accommodation when he gave Ed Dr. Hreibe's October 15, 2012, note stating that Plaintiff could return to work "as tolerated." By way of further communication, Plaintiff advised Ed in his November 25, 2012, email that he interpreted Dr. Hreibe's note to mean that "if my heart is racing, I am dizzy or fatigued I should go home and rest." (ECF No. 40-21 at 2.) These communications were sufficient to communicate a request for assistance. *See Taylor*, 184 F.3d at 313 (stating that the request "does not have to be in writing, be made by the employee, or formally invoke the magic words 'reasonable accommodation,'" but it "nonetheless must make clear that the employee wants assistance for his or her disability").

As to the third and fourth elements, however, the court finds that there are questions of fact concerning: (a) whether Ed Cernic failed to assist Plaintiff in his search for a suitable accommodation; and (b) whether Plaintiff could have been reasonably accommodated but for Ed's alleged lack of good faith. Construed in the light most favorable to Defendants, the evidence establishes that Ed Cernic, after receiving Dr. Hreibe's note, made multiple attempts to

contact Dr. Hreibe and left messages in an attempt to obtain greater clarification about Plaintiff's limitations, but Dr. Hreiebe failed to return the calls. Ed claims that he then asked Plaintiff to contact Dr. Hreibe on his behalf but, again, he never heard back from Dr. Hreibe. Ed further states that, in the absence of any feedback from Dr. Hreibe, he requested that Plaintiff submit to an independent medical examination, but Plaintiff never responded to this request. Finally, there is evidence in the record to suggest that Dr. Hreibe would have granted Plaintiff a full release to work if he had requested one, but Plaintiff evidently did not do so. (ECF No. 46, ¶¶ 277-78; ECF No. 49 ¶¶ 277-78.) Collectively, this evidence is sufficient to demonstrate that Ed Cernic made a good-faith effort to engage in an interactive process with Plaintiff and that any breakdown in the process was attributable to the actions of Plaintiff or his physician.

Plaintiff's summary judgment motion is premised upon the fact that Ed Cernic told Plaintiff that he had to provide a "full" or "unconditional" release before returning to work. According to Plaintiff, this essentially constitutes a *per se* violation of the ADA. Under the particular facts of this case, however, the Court is not persuaded that Ed's request for an "unconditional release" compels the conclusion that he was responsible for a breakdown in the interactive process. Rather, in the context of this case, Ed Cernic's demand for an "unconditional release" can reasonably be viewed as a request for reassurance from Plaintiff's physician or, failing that, from an independent physician, that Plaintiff could safely perform all of the essential duties of his job. As Ed testified, Plaintiff was responsible for, among other things, driving vehicles and operating a forklift, and Ed "was concerned that maybe [Plaintiff] couldn't physically perform his job in a safe manner to himself and others." (E. Cernic Dep. at 27:17-19, 126:18-23, 127:14-19, 213:23-214:24, ECF No. 40-43.) The record reflects that Ed was

primarily concerned about the fact that Plaintiff had reportedly experienced dizzy spells and "blacked out" while at work. As Defendants observe, the unpredictability of these symptoms presented at least a potential danger to Plaintiff and to his coworkers when performing everyday tasks such as driving customers' vehicles, lifting engines, using heavy machinery, or moving vehicles. It is also relevant that, as of October 2012, Defendants possessed limited information about Plaintiff's medical status, apart from the fact that Plaintiff was suffering from an unknown, heart-related condition that was causing the dizziness and blackouts. After Plaintiff had been off work for an extended period, Ed Cernic requested that Plaintiff provide a clearance from his doctor. (ECF No. 46 ¶ 262; ECF No. 49 ¶ 262.) In the context of these circumstances, Dr. Hreibe's October 15, 2012, note stating only that Plaintiff could work "as tolerated" was hardly clarifying.

Courts have recognized that "[t]he goal of the interactive process is to help identify the precise limitations of the employee's disability and the potential options that could reasonably accommodate those limitations." *Jones v. United Parcel Serv.*, 214 F.3d 402, 407 (3d Cir. 2000). The process must be "interactive" because "each party holds information the other does not have or cannot easily obtain." *Taylor*, 184 F.3d at 316. Relevantly, "'employers will not always know what kind of work the worker with the disability can do," just as workers "may not be aware of the range of available employment opportunities.'" *Id.* (quoting *Mengine v. Runyon*, 114 F.3d 415, 420 (3d Cir. 1997)). Here, the evidence of record allows for competing inferences about Ed Cernic's actions as they relate to the interactive process. Although it would not be compelled to do so, a jury could reasonably infer that Ed Cernic's requests for an unconditional clearance and/or an independent medical examination were attempts to elicit more specific

information about the precise nature of Plaintiff's physical limitations and the impact that they would have on Plaintiff's ability to return to his job, consistent with the employer's duties under the ADA.

The Court also perceives an issue of fact as to whether Plaintiff can establish the fourth element of his failure-to-accommodate claim. Under the ADA, an "employer is under no obligation to maintain the employment of a plaintiff whose proposed accommodation for a disability is 'clearly ineffective.'" *Gardner*, 636 F. App'x at 84 (quoting *Walton*, 168 F.3d at 670). It is the plaintiff's burden to demonstrate that his proposed accommodation would effectively allow him to perform his essential job functions. *See id.* (noting that the interactive process between employee and employer does not "remove the employee's burden of showing that a particular accommodation rejected by the employer would have made the employee qualified to perform the job's essential functions") (citing *Taylor*, 184 F.3d at 317); *Fogleman v. Greater Hazleton Health Alliance*, 122 F. App'x 581, 585-86 (3d Cir. 2004) ("The plaintiff bears the burden of identifying the reasonable accommodation.").

Here, Plaintiff's requested accommodation involved working "as tolerated" and being absent from his job whenever his heart started "racing," he was dizzy, or he felt fatigued. Given the nature and extent of Plaintiff's job duties and the inherently unpredictable nature of his symptoms, a jury could conclude that Plaintiff's requested accommodation would not allow him to carry out the essential functions of his employment. For example, one of Plaintiff's job duties entailed conducting vehicle inspections, and he was one of two regular employees at Cernics, Inc. who had a state motorcycle inspection license. (ECF No. 46 ¶¶ 222-223, 240, 249;

ECF No. 49 ¶¶ 222-223, 240, 249.) Consequently, there were times when Plaintiff was needed at work because he would be the only employee who could perform a state inspection.

Additionally, the evidence establishes that Plaintiff was uniquely knowledgeable about Suzuki products and was hired specifically for his expertise in that area. According to Defendants, a significant part of Plaintiff's job duties entailed work in the Service Department. A particular job function may be essential if there are a limited number of employees who can perform the function or if the job function in question is highly specialized and the plaintiff was hired specifically for his expertise or ability to perform the function. 29 C.F.R. § 1630.2(n)(2)(ii)-(iii). Accordingly, Plaintiff's regular presence in the service department may be considered an essential part of his employment. Moreover, the evidence establishes that, as general manager, Plaintiff was responsible for virtually everything that went on at the Duncansville Store. Ed Cernic testified that Plaintiff was generally needed in the store about forty-five hours per week, as he was the "eyes and ears" of the business and kept the Cernic brothers up to date on daily events. (E. Cernic Dep. at 92:19-93:8, 213:6-20, ECF No. 40-43.)

In light of these facts, and given the unpredictable nature of Plaintiff's symptoms and the indeterminate amount of time that he would need to be absent from work, it is at least debatable whether Plaintiff's proposed accommodation would permit him to perform the essential functions of his job. The Third Circuit Court of Appeals has recognized that "leave may be a reasonable accommodation when the plaintiff offers evidence that the leave would be temporary and 'would enable the employee to perform his essential job functions in the near future.'" *Gardner*, 636 F. App'x at 84 (quoting *Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 151 (3d Cir. 2004)). On the other hand, a leave request that is too indefinite is not a

"reasonable accommodation." *See, e.g., Fogleman*, 122 F. App'x at 585-86 (finding that the plaintiff's request "in the nature of time off from work for treatment" was not a reasonable accommodation where the requested leave was for "an indefinite and open-ended period of time"); *Krensavage v. Bayer Corp.*, 314 Fed. Appx. 421, 426 (3d Cir. 2008) ("[I]t has been recognized that an open-ended disability leave is not a reasonable accommodation under the ADA where, as here, the plaintiff does not present evidence of the expected duration of her impairment.") (citing *Rascon v. U.S. West Communs., Inc.*, 143 F.3d 1324, 1334 (10th Cir. 1998) ("[A]n indefinite unpaid leave is not a reasonable accommodation where the plaintiff fails to present evidence of the expected duration of her impairment.")); *Shafnisky v. Bell Atl., Inc.*, No. 01-CV-3044, 2002 U.S. Dist. LEXIS 21829, at *31 (E.D. Pa. Nov. 5, 2002) ("Open-ended disability leave is not a reasonable accommodation.").

Based on this record, it is not clear what Plaintiff's request for sporadic time off would have entailed or whether it would have permitted him to perform all of the essential functions of his job as general manager. Plaintiff intimates that he could have met the demands of his job using his two weeks of vacation when needed and minor absences beyond that to attend medical appointments and treatment, but the record would also support a contrary inference. The medical evidence indicates that, as of November 20, 2012, Plaintiff was unable to complete a nine-hour workday and felt "drained" after seven hours. ([ECF No. 40-35 at 2.](#)) As of November 30, 2012, Dr. Tilyou remarked in his progress notes that he "[could not] see how [Plaintiff] can work full time." ([ECF No. 46-24 at 2.](#))

In March 2013, Plaintiff was still seeking treatment for symptoms that Dr. Callans considered "fairly severe." ([Callans Dep. at 8:2-6, ECF No. 40-37.](#)) According to Dr. Callans,

Plaintiff was having some difficulty getting through day-to-day activities, although he was managing to do so. (*Id.* at 12:23-25.) While Dr. Callans testified that he would not have restricted Plaintiff from working during this time frame, he noted that Plaintiff had "good days and bad days" and experienced fatigue "fairly commonly." (*Id.* at 13:10-22.) On March 27, 2013, Dr. Callans performed a successful PVC ablation, which greatly reduced Plaintiff's symptoms, but he did not issue a release without restrictions until May 30, 2013. (ECF No. 40-38 at 2; ECF No. 40-39 at 2; ECF No. 40-40 at 2.) Although Plaintiff has submitted evidence that he worked full-time without difficulty in 2014 and 2015, the record is less clear about his employment success, if any, in 2013. In short, a trier of fact could draw competing inferences concerning the extent of the leave that Plaintiff would have required if he had he been permitted to work at Cernics, Inc. "as tolerated." Given Ed Cernic's testimony concerning the nature of Plaintiff's employment duties and the need for Plaintiff to be present in the store most days and available forty-five hours a week, it is a disputable question of fact whether Plaintiff's absences would have enabled him to perform his essential job functions as general manager.

In sum, there are numerous disputed issues of fact on this record that are material to a resolution of Plaintiff's prima facie case under the ADA and the PHRA. The presence of these disputed issues of fact makes an award of summary judgment in Plaintiff's favor inappropriate.[7]

---

[7] The Court notes that, in addition to defending Plaintiff's prima facie case, Defendants have asserted an affirmative defense based on their theory that Plaintiff's symptoms posed a "direct threat" of substantial harm to himself and others. *See* 42 U.S.C. § 12113(b); 29 C.F.R. § 1630.2(r). In light of the Court's determination that a jury could find in favor of Defendants at the prima facie stage, it is unnecessary to for the Court to opine at this juncture on the merits of Defendants' "direct threat" defense.

**V.      Conclusion**

For the reasons stated above, the motion for summary judgment filed by Plaintiff Gary Evans, Jr. will be denied.

An appropriate order follows.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **GARY EVANS, JR.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Action No. 3:14-cv-125** |
| | ) | |
| v. | ) | **Judge Kim R. Gibson** |
| | ) | |
| **CERNICS, INC. d/b/a CERNICS** | ) | |
| **SUZUKI, JEFFREY CERNIC, and** | ) | |
| **EDWARD CERNIC,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## ORDER

**AND NOW,** this 16th day of August, 2016, upon consideration of the motion for summary judgment filed by Plaintiff Gary Evans, Jr. (ECF No. 38), and in accordance with the accompanying memorandum opinion, **IT IS HEREBY ORDERED** that Plaintiff's motion for summary judgment is **DENIED**.

**BY THE COURT:**

**KIM R. GIBSON**
**UNITED STATES DISTRICT JUDGE**